Kermit E. **LACKEY,** William A. Shipley, and Murray F. Tysinger, Jr., Plaintiffs,

v.

**WHITEHALL CORPORATION,** et al., **Defendants.**

Civ. A. No. 85–2639–S.

United States District Court, D. Kansas.

Dec. 12, 1988.

Matthew C. Haverty, Mark V. Parkinson, Bruce Keplinger, Payne & Jones, Chtd., Overland Park, Kan., for plaintiffs.

David J. Waxse, Shook, Hardy & Bacon, Overland Park, Kan., Michael V. Abcarian, Johnson, Bromberg & Leeds, Dallas, Tex., for defendant and third-party plaintiff.

Barton Brown, Kip A. Kubin, Wallace, Saunders, Austin, Brown and Enochs, Chtd., Overland Park, Kan., for third-party defendant.

## MEMORANDUM AND ORDER

SAFFELS, District Judge.

A court trial was held in this Employment Retirement Income Security Act ("ERISA") and breach of contract case on November 8, 1988 and November 9, 1988. After reviewing the evidence presented, the court is now prepared to rule.

### FINDINGS OF FACT

1. Whitehall ("Whitehall") Corporation is a Delaware corporation with its principal place of business in Dallas, Texas. At all relevant times, Mr. Lee Webster has been Whitehall's chief executive officer and chairman of the board.

2. Crystek is a subdivision of Whitehall, having its principal place of business in Fort Myers, Florida. Crystek's traditional line of business was the manufacture and sale of radio frequency control crystals.

3. In the latter part of 1979, Wallace C. Wilson was hired by Whitehall to be general manager of the Crystek subdivision. He reported directly to Mr. Webster and was unable to take certain actions without Webster's approval (e.g., hiring of personnel).

4. Plaintiff Kermit Lackey was employed to serve as Crystek's manager of manufacturing in January 1980.

5. Plaintiff William A. Shipley was employed in November 1981, to serve as Crystek's director of marketing.

6. Plaintiff Murray F. Tysinger, Jr. was employed in November 1981, to serve as Crystek's director of engineering.

7. In July 1981, Mr. Wilson prepared a "five year plan" for the future growth of the Crystek subdivision. The plan was submitted to Mr. Webster. The plan proposed a scheme for transforming Crystek into the only quartz crystal facility serving both original equipment manufacturers and end-users in the commercial two-way communications market. This ambitious undertaking was the goal for Crystek agreed to by Mr. Webster and Mr. Wilson.

8. Mr. Wilson believed that two key personnel (Tysinger and Shipley) were necessary for the success of the five year plan. Mr. Wilson had talked individually with Tysinger and Shipley in May, 1981, at an industry symposium. They expressed interest in the prospective positions.

9. In September 1981, Mr. Wilson drafted an offer of employment to each of the two key personnel outlining the compensation benefits for each. The draft offer included pension plans for the two individuals. Mr. Webster reviewed the draft offer and objected to the pension terms. However, deferred compensation provisions were substituted for the pension plans. These provisions were included to make the offer enticing and especially to persuade Tysinger to leave his employment with General Electric. Identical provisions of deferred compensation were included in the employment offers made to both Tysinger and Shipley. The offers stated:

> Deferred compensation of 20% of salary annually, vesting at 20% per year, to be funded at the end of 5 years, upon earlier termination, or as negotiated by the parties.

Exhibits 4, 5, 408 and 409. Both Tysinger and Shipley accepted the employment offers.

10. On January 12, 1982, Mr. Wilson offered deferred compensation benefit to Kermit Lackey. This was done by a handwritten memorandum to Lackey, which incorporated the exact language used in the earlier offers to Tysinger and Shipley. Exhibits 6 and 410. In similar fashion, on March 10, 1982, Mr. Wilson extended an identical deferred compensation benefit to another current Crystek employee, Kenneth Lee, controller at Crystek. Exhibits 7 and 411. When Joseph Dutka was offered the manager of process engineering position on March 27, 1982, a deferred compensation benefit was included in the offer. Exhibits 8 and 412.

11. Mr. Wilson explained the method of calculation for the deferred compensation provisions to Tysinger, Shipley and Lackey in the same manner. Mr. Wilson explained that 20% of the employee's salary would be set aside and vested each year. Thus, at the end of five years, the deferred compensation would be 100% vested. Bookkeeping records at the Crystek subdivision for the years 1982, 1983 and 1984 reflect this method of calculation.

12. On February 18, 1985, Mr. Webster sent Mr. Wilson a memorandum stating that he had learned of Crystek's method of calculating the deferred compensation and that this method was incorrect. Mr. Webster advised Mr. Wilson to correct the calculation method and to adjust Crystek's records to reflect his (Webster's) understanding of the deferred compensation provisions. According to the Whitehall (Webster's) interpretation of the benefit term, the deferred compensation would be 20% of the employee's annual salary, 20% of which would be vested each year (therefore 4% of the salary would vest each year, 20% of 20%). Mr. Webster claimed this was the intended method of calculation and the method he had instructed Mr. Wilson to use.

13. Mr. Wilson communicated to Tysinger, Shipley and Lackey that Mr. Webster believed a different calculation method should be used on the deferred compensation benefits, and that Mr. Webster disap-

proved of the method Crystek had been using.

14. On July 15, 1985, Murray Tysinger resigned his position with Crystek to accept an employment offer with another company.

15. With Tysinger's departure, the five year plan for expansion into new markets was a failure. It had not been successful even before his departure. On August 16, 1985, Mr. Wilson resigned as general manager of the Crystek subdivision and accepted an agreed settlement for his deferred compensation.

16. On August 29, 1985, Mr. Webster traveled to Fort Myers, Florida. There, he announced the appointment of John Erasmus as Mr. Wilson's successor, the abandonment of the five year plan, and the return to traditional markets. Also, he met separately with Shipley, Lackey and Dutka. Mr. Webster stated that Whitehall had never intended to extend the deferred compensation provision to Lackey or Dutka, but that the corporation would honor the extension, using the method of calculation it understood. Mr. Webster offered each of the three employees continued employment with Crystek, and stated that they would each receive the accrued deferred compensation, but in accordance with the calculation method he had intended, and not the one used by Mr. Wilson. Dutka accepted the offer. Lackey initially accepted the offer, but the following day he informed Erasmus that the deferred compensation as outlined by Webster was unacceptable. Thus, Lackey decided to leave his position with Crystek.

17. In his separate meeting with Shipley, Mr. Webster offered continued employment and explained Whitehall's understanding about the method of calculating deferred compensation. Shipley refused to accept Whitehall's method of calculation and chose to leave the company.

18. The deferred compensation was to be paid out of the general assets of Whitehall Corporation.

19. The parties agree on the amounts of vested deferred compensation owed to each plaintiff under both the disputed methods of calculation. (All parties agreed at trial that Exhibits 416, 417 and 418 accurately reflected the amounts under both methods. However, plaintiff Shipley claims his base salary was greater in 1984 and 1985 than reflected in Exhibit 417.) The amounts are as follows:

| Name of Party | Whitehall's Method | Plaintiffs' Method |
|---|---|---|
| Tysinger | $19,348.21 | $34,886.42 |
| Shipley | $13,592.10 | $23,876.04 |
| Lackey | $11,773.10 | $21,286.22 |

## CONCLUSIONS OF LAW

### A. ERISA Coverage

■ The issue presented is whether the facts show the establishment or maintenance of a "plan, fund or program" covered by ERISA. 29 U.S.C. § 1002(2). "The existence of a 'plan' is a prerequisite to jurisdiction under ERISA." *Jervis v. Elerding*, 504 F.Supp. 606, 608 (C.D.Cal. 1980). Deferred compensation provided in a contract negotiated by an employer and an individual employee is not an employee benefit plan for the purposes of ERISA. *See Id.* at 608–09 (quoting Goodman & Stone, *Exempt Compensation Arrangements Under ERISA*, 28 Cath.U.L.Rev. 445, 452, 452–53 (1979)).

Plaintiffs argue that the deferred compensation provisions constitute an unfunded ERISA covered plan for the Crystek management team. Whitehall argues that the deferred compensation provisions are terms of the employment agreements executed with the individual plaintiffs on an ad hoc basis, and not a benefit plan for company managers. Whitehall contends that it never established or maintained a plan within the meaning of ERISA.

■ The court finds that the Crystek deferred compensation provisions are terms included as part of the employment agreements with select individuals, and not an ERISA covered benefit plan. *McQueen v. Salida Coca–Cola Bottling Co.*, 652 F.Supp. 1471 (D.Colo.1987), is supportive of the court's decision. In that case, a cur-

rent employee of defendant entered into a "deferred compensation agreement" with the defendant. After examining the agreement as a whole, the United States District Court of Colorado found the deferred compensation agreement to be an employment agreement, and not an ERISA plan. *Id.* at 1472. *See also Jervis,* 504 F.Supp. at 609 (finding that "the parties simply entered into an employment contract and did not create an employment pension benefit plan.")

In the present case, plaintiffs Tysinger and Shipley received the deferred compensation as part of their individual employment contracts. The benefit was included in Crystek's offer of employment to induce these two key personnel to join the Crystek division. Like the plaintiff in *McQueen,* plaintiff Lackey, a current employee, also received the deferred compensation benefit as a part of an employment agreement. The deferred compensation benefit was never initiated or treated as a general plan for the management team of Crystek. It was simply a provision provided to select employees as part of their individual employment agreement with Crystek.

Moreover, the *McQueen* court also buttressed its finding by the fact that the deferred compensation agreement in that case failed to comply with many ERISA provisions. *McQueen,* 652 F.Supp. at 1472 (no employee contribution to the fund, no fiduciary named, no procedure for amendments to the plan, and none of the assets were held in trust). Similarly, the present deferred compensation benefit does not comply with many ERISA provisions regarding the implementation of an ERISA covered plan. There are no plan documents, no funding accounts, no named fiduciaries or trustees, and no assets held in trust. These factors, coupled with the fact that the deferred compensation provisions resulted from individually negotiated employment contracts, leads the court to conclude that the deferred compensation provisions at issue are not part of an ERISA-covered benefit plan.

Plaintiffs rely heavily on a Third Circuit case, *Barrowclough v. Kidder, Peabody &*

*Co.,* 752 F.2d 923 (3d Cir.1985). However, in that case, the parties did not dispute that the deferred compensation plan was covered by ERISA. *See id.* at 930. The issue in that case involved the scope of certain exemptions to ERISA requirements regarding the covered plan. In the present case there is no ERISA covered plan, therefore the court does not need to explore the scope of ERISA provisions for particular types of covered plans. Moreover, the deferred compensation benefit in *Barrowclough* was available to any company executive earning more than $75,000 per year, it was not a benefit acquired through individual contract negotiations. *Id.* at 926.

### B. Wrongful Discharge

Plaintiffs Shipley and Lackey have asserted claims for wrongful discharge, in violation of 29 U.S.C. § 1140. Since the court finds that ERISA does not govern this employment arrangement, these claims will be dismissed.

Plaintiffs do not, and cannot, attempt to recover for wrongful discharge under a common law theory. Under Florida common law, the plaintiffs were employees at will. *See Knudsen v. Green,* 116 Fla. 47, 52, 156 So. 240, 242 (Fla.1934) (If the employee contract does not guarantee employment for a definite period of time, the employment relationship is terminable at will by either party.); *Roy Jorgensen Assoc., Inc. v. Deschenes,* 409 So.2d 1188, 1190 (Fla.App. 4th Dist.1982). Therefore, defendant could terminate plaintiffs' employment at any time. Moreover, the court has found that Shipley and Lackey voluntarily chose to leave their employment.

### C. Contract Claims

█ The present action is a simple case of contract construction. The whole basis of this lawsuit centers on two differing interpretations of the method of calculating the deferred compensation provisions in plaintiffs' employment contracts. In deciding this contract case, the court will apply the laws of Florida. Kansas' choice of law rules for contract construction is lex loci, the place where the contract was made.

*Simms v. Metropolitan Life Ins. Co.*, 9 Kan.App.2d 640, 642, 685 P.2d 321, 324 (1984); *Fagan v. John Hancock Mutual Life Ins. Co.*, 200 F.Supp. 142, 143 (D.Kan. 1961). Florida's choice of law rule is the same. *See Jemco, Inc. v. United Parcel Service, Inc.*, 400 So.2d 499, 501 (Fla.App. 3rd Dist.1981), *cert. denied*, 412 So.2d 466 (Fla.1982) (The validity and substantive obligations of contracts are determined by the law of the place where the contract is made (lex loci contractus).); *Goodman v. Olsen*, 305 So.2d 753, 755 (Fla.1974).*

■■■■ There can be no question about valid contract formation in this case. Each plaintiff was offered employment which included a compensation term providing for deferred compensation benefits. Each plaintiff accepted these offers. Defendant Whitehall argues that consideration is lacking regarding the tender of deferred compensation benefits to plaintiff Lackey. Lackey had been working for Crystek for two years when General Manager Wilson extended the benefits to him. The court finds that adequate consideration existed to create a contract regarding the benefit term. In this employment at will situation, Lackey's continued work performance is sufficient consideration of the promise of deferred compensation benefits. *See Bayshore Royal Co. v. Doran Jason Co.*, 480 So.2d 651, 656 (Fla.App. 2d Dist.1985) (quoting extensively from 11 Fla.Jur.2d *Contracts* § 63 at 355–57 (1979)) ("Mere inadequacy of consideration is not a sufficient cause for rescinding or canceling a contract unless the inadequacy is so gross as to afford proof of acts of fraud, or unless the inadequacy is accompanied by other circumstances such as weakness of mind or the like . . . ." Consideration is sufficient "if the promisee, in return for the promise, does anything legal which he is not bound to do, . . . ."). Lackey continued working for Crystek after he was promised deferred compensation. He was not legally bound to continue working.

The contract provision at issue states:

Deferred compensation of 20% of salary annually, vesting at 20% per year, to be funded at the end of 5 years, upon earlier termination, or as negotiated by the parties.

The parties have set forth two differing interpretations of this provision which was part of each plaintiff's employment contract. These differing interpretations are set out in Findings of Fact numbers 11 and 12.

The duty of construing a contract is that of the court and not the jury. *Paddock v. Bay Concrete Industries, Inc.*, 154 So.2d 313, 316 (Fla.App. 2d Dist.1963); *Roy Jorgensen Associates*, 409 So.2d at 1190. In construing a contract provision, the court should arrive at the natural and reasonable meaning of the words used. *See Thompson v. C.H.B., Inc.*, 454 So.2d 55, 57 (Fla. App. 4th Dist.1984). The court finds that both interpretations offered by the parties are reasonable ones. Plaintiffs' interpretation creates a very generous deferred compensation benefit, however, it is not unreasonable. Since the provision is subject to two reasonable interpretations, the provision is ambiguous.

In interpreting ambiguous contract language, the court should consider the circumstances existing at the time the parties entered into the contract. *See Dade County v. OK Auto Parts of Miami, Inc.*, 360 So.2d 441, 444 (Fla.App. 3d Dist.1978), *cert. denied*, 379 So.2d 207 (Fla.1979); *Trio Sales, Inc. v. Crossroads Shopping Center, Inc.*, 324 So.2d 118, 120 (Fla.App. 2d Dist.1975), *cert. denied*, 336 So.2d 599 (Fla. 1976). Here, Crystek was attempting to attract what it considered key personnel, and offered deferred compensation as an enticement for them to leave their current employment.

Also, in interpreting ambiguous contract language, the court should give considerable weight to the parties' interpretation shown by their own actions. *Ace Electric Supply Co. v. Terra Nova Electric, Inc.*, 288 So.2d 544, 548 (Fla.App. 1st Dist 1973) (citing *Orlando Orange Groves Co. v.*

---

* The court notes that the choice of law has very little impact on the ultimate decision, as the canons of contract construction are almost uniform in all states.

*Hale,* 119 Fla. 159, 161 So. 284, 295 (Fla. 1935)). If the parties' conduct places a reasonable interpretation on the contract, this interpretation will be applied by the court. *Welsh v. Carroll,* 378 So.2d 1255, 1257 (Fla.App. 3d Dist.1979); *Bay Management, Inc. v. Beau Monde, Inc.,* 366 So.2d 788, 793 (Fla.App. 2d Dist.1979). Here, Wallace Wilson, the general manager of Crystek and the person who negotiated the employment contracts with the plaintiffs, explained the deferred compensation method of calculation in terms identical to the method now claimed by the plaintiffs. Plaintiffs had no reason not to rely on the representations of Crystek's general manager. Any failure of Wilson to follow the instructions of Whitehall's chairman, Lee Webster, which Whitehall alleges, is irrelevant regarding the plaintiffs' understanding of their employment contract. Moreover, Crystek's company records reflect that accrued deferred compensation was entered on the subdivision's books in accordance with the calculation method claimed by plaintiffs. The court finds that employer Crystek and the plaintiffs, by their conduct, adopted the construction of the provision now claimed by plaintiffs.

Finally, ambiguity should be construed against the drafter of the contract. *Hurt v. Leatherby Ins. Co.,* 380 So.2d 432, 434 (Fla.1980). Here, defendant drafted plaintiffs' employment contracts which included the deferred compensation provision. Thus, this ambiguous term should be construed in favor of plaintiffs.

Although the plaintiffs' interpretation provides for very generous deferred compensation and Whitehall's interpretation may seem more realistic, the term is ambiguous. Given the circumstances at the time of the contracts' formation and the interpretation given by the parties pursuant to their own actions, the court finds that plaintiffs' interpretation of the provision is the correct one and the one intended by the parties at the time of contracting.

### D. Damages

At the trial, the parties stipulated to the different amounts under the two proffered methods of calculation. *See* Exhibits 416–18. These exhibits establish the amount of deferred compensation to which each plaintiff is entitled under their respective employment contract. The court finds that under the terms of their employment contracts, plaintiffs are entitled to recover the following amounts as deferred compensation:

1. Plaintiff Tysinger is entitled to recover $34,886.42.

2. Plaintiff Shipley is entitled to recover $23,876.04.

3. Plaintiff Lackey is entitled to recover $21,286.22.

IT IS BY THE COURT THEREFORE ORDERED that the Clerk of the District Court enter judgment in this action for the plaintiffs in accordance with the above Memorandum and Order.